NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                          :
MARY BETH BYRNE,                          :
                                          :
                    Plaintiff,            :
        v.                                :      CIVIL ACTION NO. 06-5184 (JAP)
                                          :
MONMOUTH COUNTY DEPARTMENT                 :
        OF HEALTH CARE FACILITIES,        :
        et al.,                           :
                                          :      **OPINION**
                    Defendants.           :
_____   :

PISANO, District Judge.

This action presents claims arising under the American with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADA"), and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq.* ("NJLAD").  Currently before the Court are motions for summary judgment brought by Defendants Monmouth County Department of Health Care Facilities ("Monmouth County"), Ilene Van Duyne ("Van Duyne"), and Robyn Snyder ("Snyder") (collectively, "Defendants").  Plaintiff Mary Beth Byrne ("Plaintiff") opposes the motions.  For the reasons set forth herein, the Court grants Defendants' motions for summary judgment and, accordingly, dismisses Plaintiff's Complaint.

I.      **BACKGROUND**

On July 30, 2001, Monmouth County hired Plaintiff as a Clerk at the Department of Health Care Facilities, Geraldine L. Thompson Care Center ("GLT"), a long-term health care facility owned and operated by Monmouth County.  (Daniel R. Roberts Certification ("Roberts

Certif.") Ex. HH).  On November 14, 2001, Plaintiff achieved status as a permanent clerk and, effective November 9, 2002, was promoted to Account Clerk.  (Roberts Certif. Ex. II, OO).  Van Duyne, Monmouth County's Executive Comptroller, and Snyder, GLT's Patient Accounts Supervisor, supervised Plaintiff.

As a county employee, Plaintiff's duties are defined by the New Jersey Department of Personnel's ("DOP") job specifications.  The New Jersey Department of Personnel ("DOP") defines the duties of an "Account Clerk" in Job Specification 00010 ("DOP Specification"). (Roberts Certif. Ex. B).  It provides that an Account Clerk, "[u]nder direction[,] performs a variety of routine, repetitive, noncomplex clerical tasks which involve computing, classifying, verifying, and recording numerical data and the reconciliation of accounts, records, and documents to keep sets of financial records complete; does other related duties as required."[1] (Roberts Certif. Ex. B, 1).

From May 2003 until June 2004, Plaintiff took a leave of absence.  According to Plaintiff,

---

[1]  The DOP Specification also sets forth "Requirements" of the job to include:
Knowledge of office methods, practices, and equipment and of performing routine, repetitive, and noncomplex tasks involved in keeping financial and/or other records of a mathematical nature.
Knowledge of basic arithmetic functions.
Ability to understand, remember, and carry out oral and written directs.
Ability to perform routine/repetitive tasks, compare numerical/verbal data, and select appropriate information for forms.
Ability to add, subtract, multiply, divide, and find averages/percentages.
Ability to apply arithmetic principles and to correct computational errors.
Ability to acquire an understanding of numerical record keeping and data gathering and other clerical procedures used in a specific establishment.
Ability to perform work requiring constant/close attention to clerical and numerical detail. . . .
(Roberts Certif. Ex. B, 2-3).

that leave was due to a variety of ailments she suffered, including lupus,[2] multiple myeloma, a

stroke, and the Human Immunodeficiency Virus ("HIV")/Acquired Immune Deficiency

Syndrome ("AIDS").  (Plaintiff Certification ("Pl. Certif.") ¶¶ 5-6).  A few months after her

return to work, on November 8, 2004, Plaintiff received a "Notice of Counseling, Oral or Written

Warning" ("Warning Notice") issued by Snyder.  (Roberts Certif. Ex. PP).  That Warning Notice

was given in response to Plaintiff's "excessive personal phone calls and use of cellular phone

during working hours."  (Roberts Certif. Ex. PP).  On March 8, 2005, Plaintiff received from

Snyder another Warning Notice in response to a "serious mistake due to carelessness when

recording deposit."  (Roberts Certif. Ex. QQ).  Snyder also noted that, at this time, Plaintiff had

problems "with the filing, [in terms of] alphabetizing[.]"  (John Brennan Certification ("Brennan

Certif.") Ex. L at 64:18-22).

Shortly thereafter, on March 25, 2005, Snyder issued a "Notice of Minor Disciplinary

Action" ("Disciplinary Notice"), setting forth, initially, that Plaintiff was to be suspended for

three days "for improper conduct or job performance[.]"  (Roberts Certif. Ex. RR).  The

Disciplinary Notice explained that Monmouth County disciplined Plaintiff for "unsatisfactory

performance of job duties[ and] willful failure to devote attention to tasks[,]" and imposed a

three-day suspension.  (Roberts Certif. Ex. RR).

Sometime during the pendency of these disciplinary matters, Plaintiff disclosed to Snyder

that she suffered from HIV/AIDS.  (Brennan Certif. Ex. L at 42:20-43:15).  After learning of

---

[2]  Lupus is a chronic inflammatory disease that may affect a person's joints, skin, kidneys, blood cells, heart, and lungs.  *See* http://www.mayoclinic.com/health/lupus/DS00115.  Four different forms of lupus exist, each with varying degrees of seriousness.  *Ibid.*  The record here does not provide the Court with the specific form of lupus suffered by Plaintiff.

Plaintiff's condition, Snyder informed Van Duyne.  (Brennan Certif. Ex. L at 45:18-46:8).

Pursuant to a letter dated July 7, 2005, Van Duyne sought legal advice as to whether she could

disclose Plaintiff's HIV/AIDS status to another GLT employee suspected of having an intimate

relationship with Plaintiff.[3]  (Brennan Certif. Ex. QQ).

On July 8, 2005, Van Duyne wrote Plaintiff a letter in response to an allegation that

Plaintiff inappropriately touched a coworker and spread rumors about another coworker.  The

letter served to remind Plaintiff of her "[i]nstances of progressive discipline[,]" spanning from

November 2004 until June 2005, and warning her that "further instances will lead to major

discipline up to and including termination."  (Roberts Certif. Ex. SS).  The letter specifically

advised Plaintiff that

> [i]t is inappropriate to approach or confront people in the workplace about personal
> relationships.  This includes lunchtime, break time and all time at the workplace.
> Further, it is disruptive to spread rumors and personal remarks about people.  It will
> not be tolerated because it is disruptive to the workplace.

(Roberts Certif. Ex. SS).  Van Duyne further stated that she had "recently learned through

investigation that there have been multiple instances of you inappropriately touching male

employees."  (Roberts Certif. Ex. SS).  Van Duyne then advised Plaintiff to "share this [letter]

with a health professional for guidance on how to get along socially in the workplace[,]" but that,

if Plaintiff chose not to discuss the issue with a health professional, Van Duyne would make a

formal management referral to the Monmouth County Employee Advisory Service.  (Roberts

Certif. Ex. SS).

---

[3]  The record also provides a note dated June 1, 2005 from Miguel A. Maseda, M.D., in
response to an inquiry by a registered nurse at GLT "regarding HIV transmission via saliva[.]"
(Brennan Certif. Ex. TT).  However, the note does not reveal if Defendants were involved in this
inquiry and if the subject matter concerned Plaintiff.

Based on an incident occurring on July 18, 2005, Snyder issued another Disciplinary Notice to Plaintiff for "[c]ontinuous unsatisfactory performance of job duties[ and f]ailure to devote attention to daily tasks resulting in repeated mistakes[.]"  (Roberts Certif. Ex. TT). Plaintiff's response was given through an attorney, who informed Defendants that Plaintiff "has an ADA covered disability that causes mistakes."  (Roberts Certif. Ex. TT).  Nevertheless, Van Duyne imposed a five day suspension without pay.  (Roberts Certif. Ex. TT).

On July 26, 2005, Plaintiff's attorney wrote to Monmouth County to advise them that Plaintiff was disabled within the meaning of the ADA and to formally request reasonable accommodations.  (Roberts Certif. Ex. EE, 1).  Various correspondence ensued between the respective attorneys.  (Roberts Certif. Ex. EE).  Significantly, attached to a letter dated August 9, 2005 from Plaintiff's attorney to Monmouth County's attorney, (Roberts Certif. Ex. EE, 7), were a letter from Paul Curtis Bellman, M.D., ("Dr. Bellman") and a letter and a note from Josh Torgovnick, M.D. ("Dr. Torgovnick"), all dated August 9, 2005.  (Roberts Certif. Ex. L).

In his letter, Dr. Bellman, a specialist in internal medicine, expressed that he was currently treating Plaintiff, who suffered "cognitive impairment from the stroke[.]"  (Roberts Certif. Ex. L, 1).  Dr. Bellman recommended certain accommodations to help Plaintiff work efficiently.  He suggested that Defendants permit Plaintiff to undertake "a self-paced workload[ t]o help reduce stress[,]" to permit her to seek emotional support by making telephone calls, and to provide her with emotional support by giving her "positive reinforcement and feedback and patience[,]" as well as staff counseling.  Dr. Bellman further recommended that Plaintiff be permitted "longer and[/]or more frequent work breaks[,]" in addition to permission "to stand or move freely around her workstation" to alleviate leg cramping.

Moreover, the doctor stated that Defendants should "[b]e sure to provide clear written instructions followed by simple verbal confirmation of duties."  Significantly, Dr. Bellman said this was necessary because Plaintiff "may become easily confused with print and[/]or numbers, especially with vouchers and photocopies[;]" thus, "allowing [her] extra time for her to complete her assigned tasks and allowing for periodic rest breaks to help reorient" herself.  Dr. Bellman also suggested that Plaintiff's work be reviewed by a supervisor or peer to point out mistakes.  Finally, Dr. Bellman stated that Plaintiff needed "a flexible work schedule to accommodate her need for medical and therapeutic care[]" as she "must visit her physician every two weeks, minimum[.]"  (Roberts Certif. Ex. L, 1).

The letter from Dr. Torgovnick stated that he had been treating Plaintiff for almost two years and that Plaintiff had suffered "a stroke-like brain injury in 2003 which is not progressive and should continue to improve over time."  (Roberts Certif. Ex. L, 2).  Dr. Torgovnick also requested certain reasonable accommodations on Plaintiff's behalf.  Specifically, he noted that Plaintiff "should not be subjected to undue stress[,]" so he believed that Defendants should permit her to work at her own pace, as she would need longer or more frequent breaks, in addition to a flexible schedule to attend to her medical and therapeutic care.  He also noted that Plaintiff suffers from "severe leg cramping" and would, thereby, need to be permitted to "get up and move around freely at her work station."  Finally, Dr. Torgovnick suggested that

> [b]ecause [Plaintiff] is recovering from a brain injury, keeping it simple, routine & repetitive will be most helpful.  Provide [Plaintiff] with clear written instructions followed by verbal confirmation by [Plaintiff] of the understanding of the task at hand.  Allowing [Plaintiff] to "buddy up" with a coworker who could instruct and review her work for accuracy and comprehension would be most helpful.

(Roberts Certif. Ex. L, 2).  A note from Dr. Torgovnick asserted: "This will certify that Ms.

Byrne is able to perform the essential functions of her positions with reasonable accommodations." (Roberts Certif. Ex. EE, 8).

Defendants thereafter agreed to implement the accommodations recommended, with the exception of providing Plaintiff with longer or more frequent work breaks. Monmouth County found that to be "an unreasonable accommodation as all employees have the same number of breaks as well as length of breaks based upon the negotiated contract." (Roberts Certif. Ex. M). Monmouth County also requested further medical documentation of Plaintiff's lupus, so that it could determine how to reasonably accommodate Plaintiff in that respect.

Despite the accommodations made by Defendants, further complaints were made in respect of Plaintiff's behavioral conduct at work. On September 28, 2005 and November 3, 2005, Plaintiff engaged in openly hostile and abrasive conduct towards her coworkers. (Roberts Certif. Ex. N & MM). On November 7, 2005, Defendants suspended Plaintiff for three days because of "unauthorized absence from work per county policy." (Brennan Certif. Ex. BBB). Further, in a memorandum dated November 22, 2005, Van Duyne informed GLT's administrators that it had come to her attention that Plaintiff had brought food from outside the facility to a resident, whom she had been seen kissing more than once. (Roberts Certif. Ex. BB). GLT's surveillance videos corroborated Van Duyne's statement, showing Plaintiff kissing a disabled resident on three separate occasions. In her memorandum, Van Duyne stated that she held a meeting with Plaintiff to discuss the issue, as Plaintiff's conduct with the resident violated professional conduct policies, but that Plaintiff was non-responsive to Van Duyne. As a result, Van Duyne recommended that, "to protect the resident's quality of life, health and overall well-being, [Plaintiff should] be disciplined for conduct unbecoming a County employee and

insubordination to the Administrator for refusing to engage in an open dialogue regarding her behavior towards a male resident."  Van Duyne added that Plaintiff "should . . . be closely monitored to ensure that the resident is not exploited for his emotional connection to" Plaintiff. (Roberts Certif. Ex. BB).

Based on this conduct, on December 14, 2005, Plaintiff received a "Preliminary Notice of Disciplinary Action."  (Roberts Certif. Ex. AA, 3).  Following a hearing on that matter, Defendants issued a "Final Notice of Disciplinary Action," informing Plaintiff that she had been charged with: (1) insubordination; (2) conduct unbecoming a public employee; (3) "[t]he use of threats or intimidation towards supervisors and coworkers[;]" (4) "[i]nappropriate or threatening language in the workplace[;]" (5) "[c]reating a disturbance while on duty[;]" and (6) "[i]nappropriate physical contact" with a GLT resident.  (Roberts Certif. Ex. AA, 4).  Defendants then imposed a thirty-day suspension, to begin on January 3, 2006.  (Roberts Certif. Ex. AA, 3).

Just prior to the issuance of this Disciplinary Notice, Plaintiff's attorney sent a letter to Monmouth County's attorney, informing him of Plaintiff's HIV/AIDS condition.  (Brennan Certif. Ex. DDD).  The letter specifically stated: "As you know [Plaintiff] suffers from Lupus and a post[-]stroke cognitive impairment.  She also has another condition.  She is HIV positive." (Brennan Certif. Ex. DDD).  Accordingly, Plaintiff's attorney requested a discussion with Defendants to consider reasonable accommodations to help Plaintiff to perform her employment duties.  Indeed, Defendants did inquire from Plaintiff and her attorney what further accommodations would aid Plaintiff in performing her job.  However, during a disciplinary hearing on December 28, 2005, Plaintiff's attorney responded that no new accommodations were necessary at that time.

-8-

During this time period, Defendants also found Plaintiff's work performance to be poor, but, in part due to Plaintiff's disabilities and need for direct supervision of her work, determined not to discipline her for these errors.  Nevertheless, on December 21, 2005, Van Duyne submitted a memo to Assistant Personnel Officer Frank Tragno ("Tragno"), enclosing a document itemizing "the instances of poor job performance" by Plaintiff.[4]  (Roberts Certif. Ex. G).  That attached spreadsheet listed 117 errors occurring between August 16, 2005 and December 5, 2005.  According to a memorandum from Tragno to Van Duyne, Van Duyne submitted the spreadsheet of errors as part of a "[r]equest for [d]isciplinary [a]ction[.]"  (Brennan Certif. Ex. C).  However, Tragno determined that disciplinary action was not necessary because Plaintiff was already serving a suspension for behavioral issues and "because the work performance issues are somewhat stale[.]"  (Brennan Certif. Ex. C).

Plaintiff's conduct that gave rise to her termination occurred on March 17, 2006.  (Roberts Certif. Ex. A, W).  According to internal memos from Snyder to Van Duyne and from Van Duyne to Tragno, on that afternoon, Snyder discovered that Plaintiff had intercepted confidential mail addressed to Van Duyne.  (Roberts Certif. Ex. W).  This mail contained a memorandum from GLT's personnel office regarding Plaintiff.  Plaintiff admits that, in an envelope addressed to Van Duyne, she "found a document that related to . . . an allegation of my allegedly harassing [a] co-worker by making a derogatory comment about her style of dress."  (Pl. Certif. ¶ 33).  According to Plaintiff, she "made a copy of the document and placed it in [her] purse[,] delivered the mail[, and then] called [her] mother about [the document]."  (Pl. Certif. ¶

---

[4]  It appears from the record that this itemization of errors was created upon request by Tragno to determine if Plaintiff's poor work performance was "serious enough to support discipline."  (Brennan Certif. Ex. D).

33).  Coworkers who overheard Plaintiff discussing the matter over the telephone informed

Snyder, who then confronted Plaintiff.  (Roberts Certif. Ex. W).  According to witnessing

coworkers, Plaintiff, upon confrontation, reacted by screaming: "I'm being harassed just because

I have HIV!"  (Roberts Certif. Ex. W).  Witnesses informed Defendants that they also heard

Plaintiff use profanity and that they felt upset and disturbed by the incident.  (Roberts Certif. Ex.

W).  Plaintiff viewed this incident as a part of the harassment she was subjected to based on her

disclosure to Snyder that Plaintiff suffered from HIV/AIDS.  (Brennan Certif. Ex. III).

As a result of this incident, on March 20, 2006, Defendants issued Plaintiff a "Notice of

Immediate Suspension" (Roberts Certif. Ex. JJ).  Ultimately, on April 12, 2006, Plaintiff

received a "Final Notice of Disciplinary Action," which informed Plaintiff that Defendants

terminated her employment, as of March 20, 2006.  (Roberts Certif. Ex. A).  Plaintiff, as a county

employee, appealed her termination to the New Jersey DOP Merit System Board.  (Roberts

Certif. Ex. GG).  The result of that appeal is not provided in the record.

Sometime thereafter,[5] Plaintiff filed a claim with the United States Equal Employment

Opportunity Commission ("EEOC").  (Brennan Certif. Ex. H).  On July 31, 2006, the EEOC

issued Plaintiff a "Dismissal and Notice of Rights," which informed Plaintiff that the EEOC did

not make a finding as to any of the issues, but that Plaintiff had the right to file an action in this

Court.  (Brennan Certif. Ex. H).  On October 28, 2006, Plaintiff filed the present Complaint,

asserting claims under the ADA and NJLAD.  Plaintiff claims that Defendants harassed and

retaliated against her based on her disabilities by initiating multiple disciplinary proceedings

against her and, ultimately, by terminating her.  Further, Plaintiff alleges that Defendants failed to

---

[5] The record does not provide an exact date.

-10-

reasonably accommodate her.

Defendants now move for summary judgment.  Defendants argue that Plaintiff cannot

sustain her claims because she was disciplined and terminated based on her improper conduct

and that she could not perform the essential functions of her job with or without reasonable

accommodation.  Snyder and Van Duyne further argue that they cannot be held liable under the

ADA or NJLAD because, as individuals, they are not "employers" within the statutes.  Plaintiff

opposes the motions.  In response, Plaintiff argues that she has set forth *prima facie* claims under

the ADA and NJLAD.  Plaintiff also submits that Defendants and her coworkers harassed her by

refusing to touch things that she touched or to eat lunch with her and by cleaning the restroom

facilities after she used them.

## II.   DISCUSSION

### A.   Standard of Review under Federal Rule of Civil Procedure 56(c)

A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law

identifies which facts are critical or "material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue

of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to present evidence that a genuine fact issue compels a trial.  *Id.* at

324.  In so presenting, the non-moving party must offer specific facts that establish a genuine

issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, *supra*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

### B.    Analysis

In her Complaint, Plaintiff essentially alleges that Defendants failed to reasonably accommodate her disability, in violation of the ADA and NJLAD, and discriminated against her in the form of retaliation and harassment because of her disabilities. Plaintiff claims she is protected under the ADA and NJLAD based on her post-stroke cognitive impairments, lupus, and HIV/AIDS infliction.

### 1.    Failure to Accommodate

The ADA provides in relevant part: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual . . . ." 42 U.S.C. § 12112(a). A "qualified individual with a disability" includes "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111(8). The ADA further specifies that "consideration

-12-

shall be given to the employer's judgment as to what functions of a job are essential, and if an

employer has prepared a written description before advertising or interviewing applicants for the

job, this description shall be considered evidence of the essential functions of the job." *Ibid.*

However, an employer's duty to accommodate is triggered only when "the employer can be fairly

said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville*

*Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

The ADA also defines discrimination, in pertinent part, to include "limiting, segregating,

or classifying a[n] . . . employee in a way that adversely affects the opportunities or status of such

. . . employee because of the disability of such . . . employee;" and "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability who is an . . . employee, unless such covered entity can demonstrate that the

accommodation would impose an undue hardship on the operation of the business of such

covered entity[.]" 42 U.S.C. § 12112(b)(1), (b)(5)(A). As a result, "[a] disabled employee may

establish a *prima facie* case under the ADA if she shows that she can perform the essential

function of the job with reasonable accommodation and that the employer refused to make such

an accommodation." *Turner v. Hershey Chocolate US*, 440 F.3d 604, 610 (3d Cir. 2006).

Similarly, NJLAD prohibits "any unlawful discrimination against any person because

such person is or has been at any time disabled or any unlawful employment practice against such

person, unless the nature and extent of the disability reasonably precludes the performance of the

particular employment." N.J.S.A. § 10:5-4.1. The statute further specifies that, "[u]nless it can

be clearly shown that a person's disability would prevent such person from performing a

particular job, it is an unlawful employment practice to deny to an otherwise qualified person

-13-

with a disability the opportunity to obtain or maintain employment . . . solely because such person is a person with a disability . . . ."  N.J.S.A. § 10:5-29.1.

The New Jersey Administrative Code further specifies that it is an unlawful employment practice for an employer to fail to reasonably accommodate an otherwise qualified individual with a disability.  N.J.A.C. § 13-2.5.  However, an employer is not required to make reasonable accommodates if the employer "can demonstrate that the accommodation would impose an undue hardship."  *Ibid.*  Further, there is no duty to accommodate if accommodation would be futile; that is, that the employee could not perform the essential functions of the job even with reasonable accommodation.  N.J.A.C. § 13-2.8(a).  Accordingly, the elements of a claim of failure to reasonably accommodate under NJLAD are the same as the elements required for such a claim under the ADA.

Applying those elements here, to succeed on her failure to accommodate claims, Plaintiff must show that: (1) she suffered from a statutorily protected disability; (2) she was qualified to perform the essential functions of the job with or without reasonable accommodations; and (3) Defendants refused to make reasonable accommodations.  *Turner*, *supra*, 440 F.3d at 610; *Seiden v. Marina Assoc.*, 315 N.J. Super. 451, 465-66 (Law Div. 1998).  Defendants concede, for purposes of these motions only, that Plaintiff's conditions are disabilities within the meaning of the ADA and NJLAD.[6]  Rather, Defendants argue that there is no dispute of fact that Plaintiff

_____

[6]  Nevertheless, the Court notes that a flat assertion of suffering from some undefined form of cognitive impairment or lupus does not necessarily meet the showing that Plaintiff suffered from disabilities protected by the ADA; that is, impairments that substantially limit a major life activity.  42 U.S.C. § 12102(2)(A).  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492-93 (1999) (finding petitioners "failed to allege adequately that their poor eyesight is regarded as an impairment that substantially limits them in [a] major life activity"); *cf. Tynan v. Vicinage 13 of Superior Court*, 351 N.J. Super. 385, 397-98 (App. Div. 2002) (discussing more lenient

could not perform the essential functions of her job, with or without reasonable accommodation, and that Defendants made all reasonable efforts to accommodate Plaintiff.

Considering the applicable standards, the Court holds that Plaintiff cannot make a claim of failure to accommodate because the record, construed in the light most favorable to Plaintiff, clearly proves that Defendants did attempt to accommodate Plaintiff's disabilities, and that any failure to do so was caused by Plaintiff.  The facts show that, upon request by Plaintiff's medical doctors, Defendants met all but one accommodation recommended by her physicians. Defendants permitted Plaintiff to have a self-paced workload, to make personal phone calls during her breaks, to move about freely in her workspace to prevent leg cramping, and to be absent from work, in accordance with county policy, in order to attend to doctor's visits. (Roberts Certif. Ex. M).  In addition, Defendants reaffirmed that it would provide Plaintiff with positive reinforcement and would treat Plaintiff with patience.  Defendants also instructed Snyder to closely supervise Plaintiff's work and to provide further instructions and confirmation as necessary.  In fact, the only recommended accommodation not followed by Defendants was that of providing longer or more frequent breaks from work.  According to Defendants, that accommodation is unreasonable because Monmouth County is contractually bound to provide all its employees the same length and number of breaks.

Regarding Plaintiff's requests for accommodation due to her lupus and HIV/AIDS conditions, Defendants attempted to engage in an interactive process, but Plaintiff herself failed to inform Defendants how her ailments required further accommodations.  In fact, upon learning

_____

definition of "disabled" under NJLAD compared to ADA).  However, the Court does recognize that a person suffering from HIV/AIDS is "disabled" under the ADA.  *See Bragdon v. Abbott*, 524 U.S. 624, 647 (1998) (holding that HIV infection is "disability" under ADA).

of Plaintiff's affliction with lupus and HIV/AIDS, Defendants requested additional information

of her disabilities to better determine the appropriate accommodations necessary.  The only

information Plaintiff submitted regarding accommodations for these disabilities was a printout of

the relevant "Job Accommodation Network" ("JAN").[7]  Although use of JAN may be useful,

employers are not "obliged to make use of this service." *Taylor*, *supra*, 184 F.3d at 317 n.8.

Moreover, at a disciplinary hearing conducted on December 28, 2005, Defendants specifically

asked Plaintiff's counsel what further accommodations were necessary, in light of Plaintiff's

HIV/AIDS and lupus conditions.  Plaintiff's counsel responded: "Not presently.  If there's going

to be any change, I will put it to you in writing."  Indeed, Plaintiff never submitted any such

writing.  As such, an employer cannot be liable for failure to accommodate if, "after conferring

with the employee to find possible accommodations, the employee then fails to supply

information that the employer needs or does not answer the employer's request for more detailed

proposals."  *Id.* at 317.

Moreover, in opposition to the present motions, Plaintiff does not suggest any further

accommodation that would have permitted her to perform the functions of her job.  In essence,

Plaintiff appears to argue that she was not permitted to perform the functions of her job due to

---

[7]  The Court notes, however, that Plaintiff proffers a letter dated July 3, 2007 from her treating physician, Dr. Bellman, in which Dr. Bellman states that Plaintiff suffers from AIDS, "multiple complications of AIDS," post-stroke cognitive impairment, and lupus.  (Brennan Certif. Ex. MMM).  To accommodate Plaintiff, Dr. Bellman recommends a flexible work schedule and reiterates the recommendations made on August 9, 2005.  The Court does not find this letter indicative of any attempt to meet Defendants' request for more information.  Significantly, this letter is unaddressed—it is marked simply "To Whom It May Concern" and there is no notation as to the recipient of this letter—and is dated more than one year after Defendants terminated Plaintiff's employment.  The Court, thus, cannot rely on this letter to find that Plaintiff complied with Defendants' request for information.

the disciplinary actions taken against her, which she alleges to have been in retaliation and part of

a harassing scheme.  However, the Court finds that the majority of the disciplinary action taken

against Plaintiff involved her social conduct, and, apart from patience, Plaintiff never requested

any accommodation permitting her to act in inappropriate manners at the workplace.  Rather, the

record indicates that, after Defendants implemented the accommodations requested, Plaintiff

adequately performed the essential functions of her job from August, 2005 until March, 2006; the

disciplinary actions taken against Plaintiff during this time frame were in response to Plaintiff's

behavioral conduct, rather than her ability to perform the duties of her job.

The Court recognizes that the ADA "does not require acquiescence to the employee's

every demand."  *Tynan*, *supra*, 351 N.J. Super. at 397.  *See also Taylor*, *supra*, 184 F.3d at 317

("The interactive process does not dictate that any particular concession must be made by the

employer; nor does the process remove the employee's burden of showing that a particular

accommodation rejected by the employer would have made the employee qualified to perform

the job's essential functions.")  Rather, both the ADA and NJLAD require an employer to make a

good faith effort to assist an otherwise qualified disabled individual.  *Armstrong v. Burdette

Tomlin Memorial Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006).  The Court, therefore, concludes that

Defendants engaged in a good faith effort to assist Plaintiff in seeking accommodations and

fulfilled Plaintiff's reasonable requests to the extent possible with the information provided.  As

a result, the Court holds that, considering the evidence in the light most favorable to Plaintiff,

Plaintiff has failed to demonstrate beyond a "mere scintilla" of evidence that a genuine issue of

material fact exists as to whether Defendants reasonably accommodated Plaintiff.  *Big Apple

BMW*, *supra*, 974 F.2d at 1363.

2.      **Discrimination**

The crux of Plaintiff's Complaint is that Defendants discriminated against her due to her disabilities.  Plaintiff claims that this discrimination came in the form of harassment and retaliation.  To set forth a claim for harassment based on a disability, Plaintiff must show that: (1) she is a "qualified individual with a disability[;]" (2) she was subjected to unwelcome harassment; (3) "the harassment was based on her disability or a request for an accommodation;" (4) "the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment;" and (5) Defendants "knew or should have known of the harassment and failed to take prompt effective remedial action." *Walton v. Mental Health Assoc. of Southeastern Penn.*, 168 F.3d 661, 667 (3d Cir. 1999).

Plaintiff also alleges that Defendants retaliated against her due to her disability in the form of repeated disciplinary actions and eventual termination from her employment.  Under the ADA, for Plaintiff to make a showing of retaliatory discrimination, Plaintiff must establish that she is a "qualified individual with a disability[,]" has suffered an adverse employment action, and that there is a causal link between Plaintiff's disability and Defendants' adverse action.  *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004) (internal quotation marks omitted).[8]  In considering such a claim, a court must apply the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).  Under that framework, once Plaintiff establishes a

---

[8]  Similarly, under NJLAD, Plaintiff must establish that: (1) she is disabled; (2) she "was performing h[er] job at a level that met h[er] employer's legitimate expectations[;]" (3) she was fired; and (4) Defendants "sought someone to perform the same work after [s]he left."  *Jansen v. Food Circus Supermarkets, Inc.*, 110 N.J. 363, 382 (1988) (internal quotation marks omitted).

*prima facie* case, the burden shifts to Defendants "to articulate some legitimate,

nondiscriminatory reason for" Plaintiff's adversary employment action. *Ibid.* (internal quotation

marks omitted). If Defendants meet that burden, then Plaintiff may "prove by a preponderance of

the evidence that the legitimate reasons offered by [D]efendant[s] were not its true reasons, but

were a pretext for discrimination." *Ibid.* Thus, central to Plaintiff's claim is a showing that, but

for Plaintiff's disabilities, Defendants would not have harassed, disciplined, or terminated her.

The facts underlying both the harassment and the retaliation claims are substantially

similar. Plaintiff submits that Defendants harassed, and ultimately terminated, her because she

suffers from HIV/AIDS and because she requested reasonable accommodations. According to

Plaintiff, Defendants isolated her, initiated multiple disciplinary matters against her,

"investigated" her, forced her to eat lunch alone, and cleaned the restroom facilities after she

used them. In addition, Plaintiff notes that someone had placed a condom on her car in the

employee parking lot and that Defendants failed to take corrective measures in response. Indeed,

Plaintiff complained to Van Duyne's superior, Stephen Kowal ("Kowal"), the Executive Director

of Monmouth County's Department of Health Care Facilities, about being harassed by Van

Duyne. (Brennan Certif. Ex. F, 25:14-20). In response, Kowal referred the matter to counsel for

Monmouth County, (Brennan Certif. Ex. F, 25:21-24), and advised Van Duyne to consult with

the county department of personnel, (Brennan Certif. Ex. F, 27:5-25). Plaintiff further submits

that Defendants terminated her, not because of her conduct at work, but because of Plaintiff's

disabilities and her demands for reasonable accommodation.

To establish causation under her harassment and retaliation claims, Plaintiff offers the

temporal proximity between her disclosure to Snyder that Plaintiff suffered from HIV/AIDS and

the beginning of Defendants' disciplinary actions over Plaintiff's behavior, as well as the alleged

onslaught of harassing conduct that ensued.  In addition, Plaintiff submits a memorandum to Van

Duyne regarding the law on disclosure of HIV status.  According to Plaintiff, Snyder and Van

Duyne, upon learning of Plaintiff's condition, sought to "investigate" Plaintiff's behavior at work

and instituted disciplinary proceedings against her based on her HIV/AIDS status.

Significantly, "to make out a claim under the ADA, the plaintiff need only show that

intentional discrimination was the *but for* cause of the allegedly discriminatory action."  *New*

*Directions Treatment Serv. v. Reading*, 490 F.3d 293, 301 (3d Cir. 2007).  Generally, "temporal

proximity between the protected activity and the termination can be itself sufficient to establish a

causal link."  *Williams*, *supra*, 380 F.3d at 760 (internal quotation and editing marks omitted).

However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory

motive before a causal link will be inferred."  *Ibid.* (internal quotation marks omitted).

Assuming that the temporal proximity between Plaintiff's disclosure of HIV/AIDS status

to Snyder and the beginning of the disciplinary proceedings instituted against Plaintiff based on

her behavior is "unusually suggestive" of discriminatory motives, Defendants have sufficiently

rebutted any such inference.  Indeed, there is no question of material fact that Defendants had

nondiscriminatory reasons for taking disciplinary actions against Plaintiff.  The record is replete

with evidence that Plaintiff engaged in conduct unbecoming a public employee, warranting

disciplinary action.  In fact, several coworkers complained to Defendants regarding Plaintiff's

inappropriate, abrasive, and disruptive conduct, and evidence submitted by Plaintiff shows her

kissing a disabled GLT resident—contact that is clearly improper for a county employee.

Moreover, Defendants aptly submit that the "investigation" allegedly undertaken by

Snyder and Van Duyne was part of Plaintiff's request for accommodation to have someone oversee her work.  Defendants explained this to Plaintiff and her counsel during a disciplinary hearing held on December 28, 2005.  At that time, Defendants stated that the list of Plaintiff's errors was created to better accommodate Plaintiff, by better supervising her and pointing out her errors—something specifically requested by Plaintiff's physician.  These statements are corroborated by the internal memoranda between Monmouth County's personnel department and Van Duyne.  Plaintiff cannot request a special accommodation of having her work reviewed and supervised and then be heard to complain that such review is harassing and retaliatory conduct.  Thus, the Court holds that Plaintiff has failed to show that Defendants' oversight and initiation of disciplinary matters against Plaintiff were based on any discriminatory motive.

    In terms of Plaintiff's allegations of a harassing atmosphere, Plaintiff submits that the "investigation" instituted by Snyder and Van Duyne had the effect of isolating her from her coworkers.  However, according to Defendants, Plaintiff's hostile conduct at the workplace caused this isolation.  The Court notes that the only evidence submitted as to Plaintiff's isolation is her own certification, whereas the record indicates that numerous coworkers filed complaints with Defendants about Plaintiff's conduct at work.  The ADA and NJLAD do not require Defendants to ensure that coworkers socialize with Plaintiff, especially in light of Plaintiff's abrasive behavior.  Absent any other proofs, the Court finds that Plaintiff has failed to present sufficient evidence to give rise to an inference that the "harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment[.]"  *Walton*, *supra*, 168 F.3d at 667.  Therefore, there is no dispute of material fact that Plaintiff was not subjected to any harassment rising to the level protected under the ADA or

-21-

NJLAD.

Finally, the Court equally finds that Plaintiff has failed to show that Defendants terminated her based on her disability.  The record clearly shows, and Plaintiff readily admits, that Defendants terminated Plaintiff for intercepting, and confiscating, confidential mail intended for her supervisor.  This egregious conduct is sufficient to meet Defendants' burden under the *McDonnell Douglas* standard to prove that they had a legitimate, nondiscriminatory reason for terminating Plaintiff.  Moreover, Plaintiff has not provided any evidence—let alone a preponderance thereof—to demonstrate that this reason was merely a pretext.  Accordingly, the Court holds that there is no dispute of material fact that Defendants initiated disciplinary matters against, and ultimately terminated, Plaintiff for legitimate nondiscriminatory reasons.

## III.    CONCLUSION

In conclusion, the Court emphasizes that Defendants attempted to engage in an interactive process with Plaintiff to accommodate her disabilities—a process that failed only because Plaintiff refused to cooperate.  Moreover, Plaintiff's flat assertions of discriminatory action are insufficient to demonstrate beyond a "mere scintilla" of evidence that a genuine issue of material fact exists as to whether Defendants harassed and retaliated against Plaintiff.  Because the Court finds that Plaintiff has failed to establish any claim under the ADA or NJLAD, the Court refrains from addressing the issue of whether Plaintiff may hold Snyder and Van Duyne individually liable under these statutes.  For those reasons, the Court grants Defendants' motions for summary judgment and dismisses Plaintiff's Complaint in its entirety.  An appropriate order accompanies this Opinion.

<u>/s/ Joel A. Pisano</u>
JOEL A. PISANO, U.S.D.J.

Dated: March 11, 2008